Fourth Division
March 27, 2008

No. 1-06-0824

THE PEOPLE OF THE STATE OF ILLINOIS,       )      Appeal from the
                                              )      Circuit Court of
          Plaintiff-Appellant,       )      Cook County.
                                              )
      v.                                     )      No. 03 CR 11006
                                              )
TAVARES HUNT,                         )      Honorable
                                            )      Fred G. Suria, Jr.,
          Defendant-Appellee.      )      Judge Presiding.

PRESIDING JUSTICE NEVILLE delivered the opinion of the court:

In May 2002, Tavares Hunt, the defendant, was incarcerated in the Cook County jail on a "no bail" order. On April 13, 2003, Hunt was arrested for the murder of Shakir Beckley, and on May 27, 2003, a Cook County grand jury indicted Hunt and charged him with 33 counts of murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 2002)), six counts of attempted murder (720 ILCS 5/9-1(a)(1) (West 2002)), two counts of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2002)), one count of aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2002)), seven counts of attempted armed robbery (720 ILCS 5/18-2(a) (West 2002)), one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2)(West 2002)), and one count of aggravated battery with a weapon (720 ILCS 5/12-4(b)(1) (West 2002)).

On January 15, 2005, Hunt filed a motion to suppress statements,[1] and on January 23, 2006,

_____

[1] Hunt's motion to suppress statements is not included in the record.

he filed a motion to exclude inaudible tape recordings that were made of his conversations with Mycal Davis on July 31, 2002, and August 6, 2002. On February 22, 2006, the trial court granted Hunt's motions. The State appeals from the trial court's February 22, 2006, order suppressing Hunt's statements and the tape recordings that were made of his conversations on July 31, 2002, and on August 6, 2002, and presents two issues for review: (1) whether the trial court erred when it suppressed Hunt's statements to Davis which were made during the course of a judicially authorized overhear of Hunt's conversations with Davis, and (2) whether the trial court abused its discretion when it excluded the Hunt-Davis overhear tapes which the State argues are only "partly inaudible." For the reasons stated herein, the trial court's order is affirmed.

## BACKGROUND

The record reveals that multiple hearings were held on the defendant's motion to suppress statements and on his motion to exclude inaudible recordings. Below is a summary of the testimony that is relevant to a resolution of the issues in this case.

### Lieutenant Joseph P. Murphy

Lieutenant Joseph P. Murphy testified that in 2002, he was assigned as the commanding officer of the Chicago police department's cold case squad. He testified that in 2002 he worked with Detective John Murray and several other officers in the cold case squad. Lieutenant Murphy also stated that over a period of months prior to July 31, 2002, he worked with Assistant State's Attorney Hovey on the investigation of Shakir Beckley's murder.

Lieutenant Murphy recalled questioning Tavares Hunt several times in 2002 about Shakir Beckley's murder. He testified that his first meeting with Hunt was in May 2002. Lieutenant

Murphy's cold case squad detectives picked Hunt up from the Cook County jail where Hunt was incarcerated on an unrelated charge. The lieutenant explained that there was a definite procedure for taking custody of Hunt from the Cook County jail. According to the lieutenant, the Chicago police told Cook County jail officials that they were taking custody of Hunt for an "investigative procedure" and that they would remove him from the jail.

Lieutenant Murphy testified that his officers brought Hunt to the Chicago police department's Area 4 Police headquarters (Area 4) for questioning on more than one occasion beginning in mid-May 2002. He stated, "[W]e went over there, we picked him up, advised him of his rights. Then we talked to him about our investigation, unrelated to the one he is in custody for." Lieutenant Murphy further testified that his detectives read Hunt his Miranda rights at the Area 4 police station and that Hunt waived his rights before talking with the lieutenant and other officers about the Shakir Beckley murder. Lieutenant Murphy also testified that Hunt consented to a polygraph examination in May 2002, and that Hunt may have been fingerprinted when he spent the night at the Area 4 police station in May 2002.

Sometime in July 2002, Lieutenant Murphy testified that he began to work with Davis, another inmate incarcerated at the Cook County jail, on the Shakir Beckley murder investigation. Lieutenant Murphy testified that Davis told him that Hunt had made incriminating statements in a conversation about the Beckley murder and the lieutenant asked Davis if he could get Hunt to repeat those statements. Lieutenant Murphy testified that he told Davis "his options" before he agreed to wear a wire for a judicially authorized overhear. According to Lieutenant Murphy, he and Assistant State's Attorney Hovey had numerous conversations about the Beckley investigation, that they

eventually decided to use Davis, and that he and Assistant State's Attorney Hovey planned the overhears of Hunt's conversations. Lieutenant Murphy stated that on or about July 17, 2002, his cold case squad detectives removed Hunt from the Cook County jail and brought him to the Area 4 police station for a lineup.

The July 31, 2002, Overhear

Two weeks later, on July 31, 2002, Lieutenant Murphy testified that he spent most of that day with Davis, the informant. Lieutenant Murphy stated that he took Davis to court to get judicial authorization for the planned overhear on July 31, 2002.[2] According to Lieutenant Murphy, he and Davis went directly from court to the Area 4 police station, where the police wired Davis in "about five minutes" and put him in an interview room with Hunt.

Lieutenant Murphy further testified that Detective Murray removed Hunt from the Cook County jail earlier on July 31, 2002, and brought him to the Area 4 police station for the planned overhear. According to Lieutenant Murphy, Hunt was put in an interview room with Davis around 3 p.m. on July 31, 2002, and no one else was allowed in the room with the two men. Lieutenant Murphy testified that the July 31, 2002, overhear began at 3 p.m. and that it ended shortly after 4 p.m. that day. Lieutenant Murphy insisted that Hunt was brought to the Area 4 police station on July 31, 2002, "strictly for purposes of participation in a line-up" and for the overhear. Finally, the lieutenant testified that he monitored the overhear sessions on July 31, 2002, and on August 6, 2002, and that neither he nor any of his detectives spoke to Hunt on either of those days about the Shakir

---

[2] It should be noted that Detective Murray testified at the suppression hearing that Judge McSweeney-Moore approved the overhear on July 30, 2002.

Beckley investigation.

## Meeting with Hunt's Attorney

While Hunt was in the room with Davis, Lieutenant Murphy testified that he and his detectives were in another room monitoring Hunt's conversation. When he took a break from monitoring Hunt's conversation, Lieutenant Murphy testified that he stepped out of the room and someone told him that a public defender, Christopher Anderson, was looking for Hunt.

Lieutenant Murphy met with Mr. Anderson, who told him that he represented Hunt on an unrelated charge. Mr. Anderson asked him why Hunt was at the Area 4 police station and Lieutenant Murphy testified that he told Mr. Anderson that there was an ongoing investigation and that a lineup was set. Lieutenant Murphy recalled that Mr. Anderson told him that he wanted to see his client and that he wanted to be present during any lineups. According to Lieutenant Murphy, he stopped the overhear and Mr. Anderson was allowed to meet with his client. At the conclusion of Hunt's meeting with Mr. Anderson, Lieutenant Murphy testified that Mr. Anderson told the lieutenant and the other officers present that he was invoking Hunt's right to remain silent and to consult with counsel during questioning.

## The August 6, 2002, Overhear

Lieutenant Murphy testified that only one overhear was done on July 31, 2002. However, on August 6, 2002, Lieutenant Murphy testified that two separate overhears were done of conversations between Hunt and Davis at the Area 4 police station , one in the morning and one in the late afternoon. He further testified that on August 6, 2002, no Chicago police officers tried to speak with Hunt about the Shakir Beckley murder. Lieutenant Murphy also testified that he

reviewed the overhear tapes of conversations that he had monitored between Davis and Hunt on July 31, 2002, and on August 6, 2002. According to Lieutenant Murphy, the tapes he reviewed accurately reflected the conversations that he monitored on July 31, 2002, and on August 6, 2002.

Tavares Hunt

Tavares Hunt testified that he was arrested on May 14, 2002, and locked up in the Cook County jail for an unrelated charge. Hunt testified that on May 18, 2002, Chicago police officers removed him from the Cook County jail and transferred him in handcuffs to the Area 4 police station. When he got to the Area 4 police station on May 18, 2002, Hunt recalled that someone told him that he was there for interrogation. Hunt testified that he recognized the prior witness (Lieutenant Murphy) as an officer present at the Area 4 police station on May 18, 2002. Hunt stated that he did not remember the names of the other police officers that questioned him on May 18, 2002, about the murder they were investigating. Hunt testified that he repeatedly told the officers that he did not know anyone in the pictures they showed him and that he had no knowledge of and had not heard anything about the murder they were investigating.

Hunt recalled telling the police on May 18, 2002, that he would not talk without his lawyer being present but the police continued to question him. Hunt testified that after questioning, he was taken for a polygraph test on May 18, 2002, and on the next day, May 19, 2002, he was fingerprinted by the Chicago police before being taken back to Cook County jail.

Hunt testified that, at the end of June 2002, he met Christopher Anderson, his public defender, in court on the unrelated case. Hunt recalled speaking to Mr. Anderson about the Chicago police "snatching him" out of jail to interrogate him about another case. Hunt further testified that

he asked for Mr. Anderson's advice about the police questioning him. Hunt recalled that Mr. Anderson told him not to talk to the police unless a lawyer was there. Hunt also stated that he asked Mr. Anderson for his phone number that day.

Hunt recalled that on July 18, 2002, the Chicago police again removed him from the Cook County jail and took him to the Area 4 police station . Hunt could not remember the names of the other detectives who questioned him that day, but he did recall that he told them that he did not want to talk about their investigation and that he wanted to talk with a lawyer.

Hunt testified that on July 31, 2002, Cook County jail guards told him that the Chicago police were coming to get him to put him in a lineup. Hunt asked the Cook County guards if he could make a phone call, the guards permitted him to make a call, and he called his lawyer. Hunt stated that he left a voice mail message for Mr. Anderson telling him that the Chicago police were taking him back to the Area 4 police station for a lineup, and he asked Mr. Anderson to come to the station.

After he had called his lawyer on July 31, 2002, the Chicago police took Hunt in handcuffs to the Area 4 police station, where he was put into a room with a man who identified himself as Mycal Davis. Hunt testified that he never knew Davis before the police put them in that room together on July 31, 2002. As Hunt recalled the incident, he was in that room alone with Davis for about an hour on July 31, 2002. Hunt testified that when he saw his public defender, later on July 31, 2002, at the Area 4 police station, Mr. Anderson told the police that he would not talk to them without an attorney being present during questioning. Hunt recalled telling the police on July 31, 2002, in his lawyer's presence, that he wanted to remain silent and that he wanted his lawyer present during any questioning.

Hunt testified that a week later, on August 6, 2002, the Chicago police removed him again from the Cook County jail and took him to the Area 4 police station . Hunt recalled that on that day the police, for the second time, put him in a room with Davis and he was held there for hours this time. Hunt also testified that he did not know that Davis was wearing a wire but he recalled eventually telling Davis to stop talking to him that day.

### Public Defender Christopher Anderson

Christopher Anderson testified that in June 2002, he was the public defender assigned to Judge Garcia's courtroom and that Hunt's case was assigned to him at arraignment on June 28, 2002. Mr. Anderson recalled speaking with Hunt in the lockup on June 28, 2002, and that he had made contemporaneous notes[3] of his conversations with Hunt.

Mr. Anderson testified that on June 28, 2002, Hunt told him that the Chicago police were talking to him about an unrelated, uncharged matter, and he told Hunt not to talk to the police. On July 12, 2002, again in Judge Garcia's lockup, Hunt told Mr. Anderson that the police were still trying to talk with him. Mr. Anderson testified that he could not discuss the matter in the lockup with others present but he stated that he again told Hunt not to talk to the police.

Mr. Anderson further testified that on July 31, 2002, he got a voice mail message from Hunt telling him that the Chicago police were removing him from Cook County jail and taking him to the Area 4 police station. Next, Mr. Anderson testified that he called the Area 4 police station and was

---

[3] Hunt waived his attorney-client privilege to his public defender's notes covering the period from their first meeting on June 28, 2002, until he invoked his rights, at the Area 4 police station on July 31, 2002. Mr. Anderson's six pages of notes were marked as People's Group Exhibit 2, but they were not included in the record on appeal.

told that Hunt was there. Mr. Anderson testified, from his contemporaneous notes, as to the events that occurred on July 31, 2002. According to Mr. Anderson, he arrived at the Area 4 police station at 3:14 p.m. on July 31, 2002, but the police did not permit him to meet with his client, Hunt, until 4:02 p.m. After meeting with Hunt, Mr. Anderson told Lieutenant Murphy and Detective Murray that Hunt was invoking his right to remain silent and to have counsel present during questioning. Finally, Mr. Anderson told the police on July 31, 2002, that he wanted to be present at any lineups involving Hunt.

Detective John Murray

The State was allowed to call Chicago police detective John Murray as a rebuttal witness and he testified that in May of 2002, he was assigned to the Chicago police department's cold case unit. He recalled that in May 2002, he was working on the Shakir Beckley murder. Detective Murray stated that on May 17, 2002, he made the arrangements to remove Hunt from the Cook County jail so that he could bring him to the Area 4 police station the next day. He also testified that on May 18, 2002, he and Detective Przepiora took Hunt from the Cook County jail and drove him to the Area 4 police station. Detective Murray admitted that Hunt had no choice about being brought to the Area 4 police station on May 18, 2002.

May 18, 2002, Police Interrogation

Beginning on the morning of May 18, 2002, Detective Murray testified that he and Detective Przepiora started questioning Hunt at the Area 4 police station. Detective Murray recalled that he interviewed Hunt for approximately 45 minutes that morning. Detective Murray testified that on May 18, 2002, Hunt denied any involvement in the Shakir Beckley murder and that Hunt claimed

to have an alibi. Detective Murray also testified that he and the other cold case detectives did not believe what Hunt was saying so Detective Murray asked Hunt to take a polygraph test. According to Detective Murray, Hunt agreed to take the polygraph, so he and Detective Przepiora took Hunt to the Homan Square station for the polygraph test. Detectives Przepiora and Murray brought Hunt back to the Area 4 police station after the test on May 18, 2002.

After returning to the Area 4 police station from the polygraph test on May 18, 2002, Detectives Przepiora and Murray interviewed Hunt again for approximately 45 minutes. Detective Murray testified that Hunt denied any involvement in the Beckley murder "all day." Because the officers' questioning went into the night and because the officers wanted to question Hunt further, Detective Murray stated that he and the other detectives decided to keep Hunt at the Area 4 police station overnight on May 18, 2002.

### May 19, 2002, Police Interrogation

Detective Murray testified that on May 19, 2002, the next day, he and Detective Przepiora interviewed Hunt again. He recalled that Lieutenant Murphy also interviewed Hunt on May 19, 2002. Detective Murray testified that Hunt continued to deny any involvement in the crime about which he was being questioned. Detective Murray testified that Hunt was returned to Cook County jail later on May 19, 2002.

### July 16, 2002, Meeting With Police Informant Davis

Detective Murray stated that Davis told him and other police officers on July 16, 2002, that he knew Hunt and that Hunt was involved in the Shakir Beckley murder. Davis also told the officers that he and Hunt had spoken about the Beckley murder and that Hunt had said that he was the "guy"

with the rifle. Davis also told the police that he thought he could get Hunt to repeat the conversation about the Beckley murder. After the conversation with Davis, Detective Murray testified that he and the other officers decided to set up an overhear using Davis as the consenting party.

### July 30, 2002, Judge Meets With Davis

Detective Murray testified that, on July 30, 2002, he was present when Davis was taken to the State's Attorney's office by Chicago police officers to sign as the consenting party for the overhear. Detective Murray recalled that Davis was taken before Judge McSweeney-Moore for review of the application for the eavesdropping order on that same day, July 30, 2002.[4]

### July 31, 2002, Overhear

Detective Murray testified that on July 31, 2002, he and Detective Przepiora removed Hunt from the Cook County jail around noon and took him to the Area 4 police station. Detective Murray was certain that none of the cold case officers interviewed Hunt that day. Detective Murray recalled that he and his team put Hunt in an interview room and left him there alone for about three hours. The officer also testified that Hunt was not handcuffed while in the interview room that day and that he gave Hunt food and water.

Detective Murray testified that at about 2:45 p.m. on July 31, 2002, Davis was brought to the Area 4 police station. He also stated that another officer took Davis into a room and put the wire on him. Detective Murray testified further that he and his team put Davis in the interview room with Hunt on July 31, 2002. Once Davis entered the room with Hunt, Detective Murray stated that he

---

[4] It should be noted that Lieutenant. Murphy testified that the overhear was approved by Judge McSweeney-Moore on July 31, 2002.

went into another room to listen to the conversation between Hunt and Davis. Detective Murray recalled that Lieutenant Murphy and another officer were in a room with Davis on July 31, 2002. At some point during the overhear, Detective Murray recalled that Lieutenant Murphy left the room. According to Detective Murray, when Lieutenant Murphy came back, they listened a bit more to the conversation between Hunt and Davis before Lieutenant Murphy ended the overhear. Shortly thereafter, Lieutenant Murphy told Detective Murray that a public defender was there to see Hunt. After an hour on July 31, 2002, Detective Murray testified that the overhear was stopped.

Meeting With Hunt's Attorney

Detective Murray testified that he met public defender Christopher Anderson at Area 4 after Mr. Anderson consulted with Hunt in an interview room on July 31, 2002. Mr. Anderson told Detective Murray that Hunt had been advised to remain silent and not to talk to the police without his lawyer being present. At that time, Detective Murray asked Hunt if he was invoking his rights. According to Detective Murray, Hunt said "yes." Finally, Detective Murray testified that the first time Hunt invoked his rights was after the overhear was stopped on July 31, 2002.

Application for Use of Eavesdropping Device Unsealed

On January 15, 2004, the trial court ordered the State's Attorney's office to unseal the envelopes and original application for the judicially authorized use of an eavesdropping device. The State's Attorney's ffice was also ordered to retain custody of the original tapes and application.

The June 27, 2005 Hearing

The parties first argued the merits of Hunt's motion to suppress on June 27, 2005. The trial court stated that the issue presented was not whether the recorded statements were voluntary, but the

legal effect of Mr. Anderson's representation of Hunt on an unindicted case where counsel had actually appeared at the Area 4 police station at 3:14 p.m. and asked repeatedly to speak with his client. The trial court then held that Hunt had a right to speak with his attorney on July 31, 2002, within a reasonable time after his attorney had arrived at the Area 4 police station, and because Hunt's attorney was not present on August 6, 2002, when Hunt spoke with Davis, that those August 6, 2002, statements were freely given. Finally, the trial court suppressed the last 45 minutes of the July 31, 2002, tape but denied Hunt's motion to suppress the statements recorded on the August 6, 2002, tapes.

### July 12, 2005, Hearing

On July 12, 2005, on its own motion, the trial court vacated its June 27, 2005 order. After further consideration, the trial court stated that it was satisfied that <u>Miranda</u> warnings were not at issue in the case. The trial court expressed concern about what, if any, professional duty an assistant State's Attorney has to not seek further information without the presence of defense counsel from a person who has asked that his counsel be present during further questioning. Therefore, after vacating its June 27, 2002 order, the trial court entered and continued the defendant's motions to suppress for further argument.

### February 15, 2006, Hearing

On January 23, 2006, Hunt filed his motion to exclude inaudible recordings. Approximately one month later, on February 15, 2006, the trial court heard arguments focused on the inaudibility of the July 31, 2002, and the August 6, 2002, tapes. The court found that all of the tapes were inaudible and that they would not be admitted. The trial court then offered to review *in camera* those

portions of the tapes that the assistant State's Attorney considered audible. The assistant State's Attorney declined the trial court's offer and requested that the trial court admit the July 31, 2002, and August 6, 2002, tapes in their entirety. The trial judge found that the July 31, 2002, and August 6, 2002, tapes were inaudible, but deferred entry of a final order at the State's request.

### February 22, 2006, Hearing

On February 22, 2006, the trial court resumed the hearing on the defendant's motion to suppress statements and entered its suppression order. After the trial court entered its suppression order, the assistant State's Attorney filed a notice of substantial impairment and a notice of appeal from the trial court's February 22, 2006, order.

### ANALYSIS

### Standard of Review

The review of a trial court's ruling on a motion to suppress evidence presents mixed questions of law and fact. People v. Pitman, 211 Ill. 2d 502, 512 (2004). The United States Supreme Court has held that while a reviewing court should carefully review the factual findings and give due weight to the trial court's inferences from those facts, "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996); People v. Sorenson, 196 Ill. 2d 425, 431 (2001). Therefore, we will accord great weight to the trial court's factual findings and will only reverse if they are against the manifest weight of the evidence, but we will review de novo the ultimate question of the State's legal challenge to the trial court's order granting Hunt's motions to suppress. Sorenson, 196 Ill. 2d at 431.

I   The Suppression of Hunt's Statements

In this case, the trial court suppressed (1) Hunt's statements to Davis, and (2) the judicially authorized tape recordings of Hunt's and Davis's conversations.  Therefore, we will consider the trial court's order suppressing Hunt's statements to Davis and suppressing the overhear tapes separately.

The State argues that the trial court erred when it granted Hunt's motion to suppress because Hunt voluntarily made statements to a fellow gang member during the course of a judicially authorized consensual overhear.  The State also argues that the provisions of the United States and Illinois Constitutions prohibiting compelled self-incrimination have no application in this case because there was no custodial interrogation.  Hunt maintains that the State violated his rights by intentionally creating a situation likely to induce him to make incriminating statements without the assistance of counsel.  Therefore, before we review the suppression order and determine whether the Hunt-Davis conversations on July 31, 2002, and August 6, 2002, were custodial or noncustodial interrogations, we must first determine whether the trial judge that issued the bail order or the trial judge that issued the eavesdropping order authorized the sheriff to release Hunt and authorized the police to take custody of Hunt.

A.   The Trial Court Has Exclusive Authority Over Pretrial Detainees[5] on Bail

The record reveals that Hunt was in the custody of the Cook County sheriff, pursuant to a "no bail" order (725 ILCS 5/110-6.1 (West 2002)), on May 18 and 19, 2002, on July 18, 2002, on July

---

[5]The supreme court defines pretrial detainees as persons who have been charged with crimes but who have not yet been tried on the charge.  Bell v. Wolfish, 441 U.S. 520, 523, 60 L. Ed. 2d 447, 458, 99 S. Ct. 1861, 1865 (1979).

31, 2002, and on August 6, 2002. The record also reveals that on May 18, 2002, on July 18, 2002, on July 31, 2002, and on August 6, 2002, Hunt was transferred from the custody of the sheriff to the custody of the Chicago police.

At oral argument, the State was asked whether the Chicago police had an arrest warrant when they took Hunt into custody and removed him from the Cook County jail on the aforementioned dates. The assistant State's Attorney stated that the police did not have a warrant and he was unable to provide case or statutory authority that authorized the Chicago police to take custody of Hunt and remove him from the Cook County jail. The State argued, however, that the "law of habeas corpus" authorized the Chicago police to remove Hunt from the Cook County jail and to put him in a lineup. Conversely, Mr. Rimland, Hunt's attorney, stated at oral argument that Judge McSweeney-Moore's eavesdropping order (1) only authorized an overhear, (2) did not authorize the police to remove Hunt from the jail, and (3) did not authorize the police to take Hunt to the Area 4 police station. We note (1) that Mr. Rimland's argument was not rebutted by the State, and (2) that the eavesdropping order was not included in the record by the State as required by Supreme Court Rule 608(a)(6). 210 Ill. 2d R. 608(a)(6) (the record on appeal must contain "all arrest warrants, search warrants, consent to search forms, eavesdropping orders, and any similar documents"). Finally, despite the State's reference to the great writ, the record does not contain any writs of habeus corpus, habeas corpus ad prosequendum, arrest warrants, eavesdropping orders or other judicial orders that were issued by the judge setting bail or by the judge issuing the eavesdropping order that authorized the sheriff to release Hunt and authorized the Chicago police to remove Hunt from the Cook County jail on July 31, 2002, or on August 6, 2002.

Next, we note that the County Jail Act (730 ILCS 125/0.01 et seq. (West 2002)) provides that the sheriff of each county is the warden of the jail; that the sheriff, as warden, has custody of all prisoners in the jail; and that the sheriff, as warden, shall receive and confine persons in the jail until discharged "by due course of law." See 730 ILCS 125/2, 4 (West 2002). The County Jail Act also prescribes the procedure for administrative transfers of pretrial detainees, like Hunt, when the facility is insufficient or when the prisoners' lives or health is endangered. See 730 ILCS 125/9, 14 (West 2002); see also 730 ILCS 155/1 (West 2002). Finally, our research reveals that section 19.5 of the County Jail Act provides that the sheriff may adopt and implement a written policy for the release of a person in custody to sworn law enforcement personnel or to the State's Attorney for the purpose of investigating other criminal matters that are unrelated to the criminal matter for which the person was in custody. 730 ILCS 125/19.5 (West 2002).

We believe that People v. Campa, 217 Ill. 2d 243 (2005), will assist this court in answering the first question presented in this case: whether the sheriff had the authority to release Hunt and transfer him into the custody of Chicago police personnel. In Campa, a defendant, incarcerated under a bail order set by the trial court, was released by the sheriff to a Day Reporting Center without posting the bond set by the court and without an order being entered by the trial court authorizing the sheriff to release the defendant. The Campa court held that the "trial court is responsible for setting and modifying bail and releasing a defendant." Campa, 217 Ill. 2d at 264; see also 725 ILCS 5/102-6, 110-6.1 (West 2002). The Campa court also held that the sheriff "cannot substitute his or her authority for that of the trial court merely by holding a defendant to conditions similar to those a court may impose." Campa, 217 Ill. 2d at 265. The facts in Campa are similar to the facts in this

case (1) because Hunt was incarcerated in the Cook County jail pursuant to a "no bail" order, and (2) because the sheriff released Hunt from Cook County's custody and into the custody of the City of Chicago's police personnel without a court order.   Therefore, we find, following Campa, (1) that the sheriff had no authority to substitute his authority for the trial court's, and (2) that the sheriff had no authority to release Hunt, a pretrial detainee subject to the trial court's no bail order, into the custody of the Chicago police.  Campa, 217 Ill. 2d at 265; see also 725 ILCS 5/110-6.1 (West 2002).

While our research revealed that section 19.5 of the County Jail Act provides that the sheriff may adopt and implement a written policy for the release of a person (Hunt) in custody to sworn law enforcement personnel or to the State's Attorney for the purpose of investigating other criminal matters that are unrelated to the criminal matter for which the person was in custody (730 ILCS 125/19.5 (West 2002)), we find, following Campa, that the provisions of the County Jail Act must be read in conjunction with the provisions of the Code of Criminal Procedure of 1963. See Campa, 217 Ill. 2d at 262-65; 725 ILCS 5/110-2, 5/110-6.1; 730 ILCS 125/4, 125/19.5 (West 2002).  The Campa court found, when it read the provisions of the speedy-trial statute related to bail and recognizance in conjunction with the provisions in the Code of Criminal Procedure, that because the trial court sets bail and otherwise sets the conditions of each prisoner's release, the sheriff is precluded from substituting his or her authority for that of the trial court.  Campa, 217 Ill. 2d at 262-65.  We find that the provisions of the Code of Criminal Procedure related to bail and recognizance also limit the sheriff's authority, under the County Jail Act,  to release prisoners being held pursuant to bail orders.  Campa, 217 Ill. 2d at 262-65.

In addition, we note that the language in section 4 of the County Jail Act provides that the

sheriff, as warden, shall confine prisoners until discharged by "due course of law," but the language in section 19.5 provides that the sheriff may adopt and implement a written policy for the release of a person in custody to sworn law enforcement personnel or to the State's Attorney. 730 ILCS 121/4 (West 2002); compare 730 ILCS 125/19.5 (West 2002). The supreme court has promulgated the following rules for construing statutes that appear to be inconsistent:

> "In construing a statute, a court must ascertain and give effect to the legislature's intent in enacting the statute. [Citation.] Where two legislative enactments allegedly conflict, this court has a duty to construe those statutes in a manner that avoids an inconsistency and gives effect to both enactments, if such a construction is reasonably possible. [Citation.] The legislature is presumed to have intended that statutes relating to a single subject and controlled by a single policy will be consistent and harmonious, and any apparent conflicts between two such statues will be reconciled if possible." Chavda v. Wolak, 188 Ill. 2d 394, 402 (1999).

Applying these principles, we find that sections 4 and 19.5 involve the same subject; therefore, the statutes must be read so that they are consistent and harmonious. Because sections 4 and 19.5 are both included in the County Jail Act, we find that section 19.5 must also be read to include a "due course of law" requirement. 730 ILCS 125/4, 19.5 (West 2002). We note that the Campa court makes it clear that a court order is required to release or transfer custody of a pretrial detainee for whom a bail order has been entered by a trial court judge. Campa, 217 Ill. 2d at 265. In light of Campa, we find that the sheriff acts with "due course of law" when he releases prisoners

on bail pursuant to a court order. <u>Campa</u>, 217 Ill. 2d at 265.

In light of the preceding, we find that the sheriff has the authority to transfer a prisoner to another facility when the facility is insufficient or when his life or health is endangered. 730 ILCS 125/9, 14 (West 2002). We find, however, that the sheriff had no authority, without a court order, to permit the Chicago police to remove Hunt from the Cook County jail or to transfer him to the Area 4 police station for conversations with Davis about the Shakir Beckley murder on July 31, 2002, or on August 6, 2002. <u>Campa</u>, 217 Ill. 2d at 262-65; 730 ILCS 125/4 (West 2002). Accordingly, we hold that where a bail order is entered and a pretrial detainee is remanded to the custody of the sheriff, a writ or judicial order is required in order to transfer custody of a pretrial detainee, like Hunt, from the custody of the sheriff to the custody of the Chicago police for the purposes of investigating an uncharged felony. <u>Campa</u>, 217 Ill. 2d at 262-65.

B.    An Arrest Occurs When Police Take Custody of a Pretrial Detainee Without His

Consent or a Court Order

Whether the police had probable cause to arrest Hunt is a legal question over which this court has <u>de novo</u> review. <u>Sorenson</u>, 196 Ill. 2d at 431. A reviewing court is not required to adopt the trial court's rationale for its decision. <u>Pitman</u>, 211 Ill. 2d at 512, citing <u>People v. Gherna</u>, 203 Ill. 2d 165, 175-76 (2003) (a reviewing court is free to undertake its own assessment of the facts in relation to the legal issues presented and may draw its own conclusions when deciding what relief should be granted). Because the police had no judicial order authorizing them to remove Hunt from the Cook County jail, we must decide if Hunt consented or volunteered to go to the Area 4 police station or whether he was arrested on July 31, 2002, and August 6, 2002. We note that Detective Murray

testified that Hunt had no choice when he was removed by the police from the Cook County jail. Hunt testified that he repeatedly told the police officers that he did not want to talk with them without his attorney being present. We also note that, on July 31, 2002, when Hunt learned that the Chicago police were coming to remove him from the county jail, he called his attorney and asked him to meet him at the Area 4 police station. Finally, the record does not contain a written consent from Hunt to waive his rights and make a voluntary statement or to accompany the police to the Area 4 police station.

Without a judicial order or Hunt's consent, we must determine whether Hunt was lawfully in police custody. Section 107-2 of the Code of Criminal Procedure provides that Illinois peace officers may only arrest when (a) the officer has a warrant for a person's arrest; (b) the officer has reasonable grounds to believe that a warrant for a person's arrest has been issued in this state or in another jurisdiction; and (c) the officer has reasonable grounds to believe that a person is committing or has committed an offense. 725 ILCS 5/107-2 (West 2002). Section 107-5 of the Code further provides that "[a]n arrest is made by an actual restraint of the person or by his submission to custody." 725 ILCS 5/107-5 (West 2002).

The record reveals that every time Hunt was removed from the county jail, he submitted to police authority and was handcuffed while being transported from the Cook County jail to the Area 4 police station; that he was never free to leave; and that he was always physically confined while he was in the custody of Chicago police. We find that Hunt's and the officers' testimony establishes that Hunt's encounters with the police on July 31, 2002, and on August 6, 2002, were not consensual or voluntary encounters. We find that Hunt never had any choice and was forced to accompany the

- 21 -

Chicago police to Area 4 police station. The record does not contain an arrest warrant for Hunt. The record does not contain any evidence that the Chicago police believed that a warrant had been issued in another jurisdiction for Hunt's arrest. The record reveals that Davis consented to wear a wire so the police could eavesdrop on his conversations with Hunt in July and August 2002, but Hunt was not indicted for the Shakir Beckley murder until May 27, 2003. The record does not contain any evidence that established that the Chicago police, in 2002, had reasonable grounds to believe that Hunt, an incarcerated, pretrial detainee, was committing or had committed a crime. We find that the cold case investigation of the Shakir Beckley murder in 2002, which included lineups, polygraph examinations and fingerprinting, did not provide probable cause for Hunt's arrest on July 31, 2002, or on August 6, 2002, or excuse compliance with the warrant requirement in the statute. 725 ILCS 5/107-2 (West 2002). Accordingly, because Hunt was removed from the Cook County jail by the Chicago police without an arrest warrant or a court order, we hold that Hunt was illegally arrested by the Chicago police on July 31, 2002, and on August 6, 2002.

C. Statements Made Subsequent to an Illegal Arrest are Inadmissible

Having held that Hunt was illegally arrested when the Chicago police removed him from the county jail without his consent or a judicial order (an arrest warrant or a judicial writ), we now consider the admissibility of Hunt's statements to Davis that were made on July 31, 2002, and August 6, 2002, while in police custody. We note that the record establishes that Davis, the police informant, was incarcerated at Cook County jail. We note that the record establishes that Hunt spoke with Davis after he was illegally arrested and transported to the Area 4 police station on July 31, 2002, and August 6, 2002. Therefore, we find that the Hunt-Davis encounters at the Area 4 police

station were not fortuitous, consensual, voluntary encounters between the two men, but illegal, nonconsensual, involuntary encounters orchestrated by the police and the assistant State's Attorney to solicit incriminating statements from Hunt.

Next, we must determine whether there are facts in the record that would break the causal chain between Hunt's illegal arrests and his statements to Davis and thereby attenuate the taint of Hunt's illegal arrests. The supreme court makes it clear that in order for the causal chain between the illegal arrest and the statements made subsequent thereto to be broken, the statements must not only be "voluntary," under the fifth amendment, but they must be acts of free will sufficient to purge the taint of the illegal arrest under the fourth amendment. Brown v. Illinois, 422 U.S. 590, 602, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261 (1975), citing Wong Sun v. United States, 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17 (1963). Here, as in Brown, the record establishes that Hunt's illegal arrests on July 31, 2002, and on August 6, 2002, had a "quality of purposefulness" (Hunt's arrests were preplanned by the police and the assistant State's Attorney); the arrests were investigatory in design and execution (the police testified that they took Hunt from the county jail because they were conducting a murder investigation); and the arrests were executed in a manner calculated to overbear Hunt's constitutional rights (the police arrested Hunt on several occasions without a court order and only sought judicial authorization for Davis to wear a wire when Hunt would not provide information and invoked his right to counsel). Brown, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.

Our review of the record failed to reveal an intervening event that would break the causal chain between Hunt's illegal arrests and his statements to Davis. Therefore, we find (1) that Hunt's

statements to Davis would not have been made but for the illegal arrests by the police (Silverman v. United States, 365 U. S. 505, 511-12, 5 L. Ed. 2d 734, 739, 81 S. Ct. 679, 683 (1961) (the fourth amendment protects against the overhearing of verbal statements as well as against the more traditional seizure of papers and effects); and (2) that Hunt's statements to Davis are fruits from the illegal arrests that preceded Hunt's trips to the Area 4 police station on July 31, 2002, and on August 6, 2002. Wong Sun, 371 U.S. at 485, 9 L. Ed. 2d at 454, 83 S. Ct. at 416 (verbal evidence that derives from an unauthorized arrest is no less the fruit of official illegality than the more common tangible fruits of an unwarranted intrusion). Accordingly, the trial court did not err when it suppressed Hunt's statements to Davis on July 31, 2002, and on August 6, 2002. Brown, 422 U.S. at 603-04, 45 L. Ed. 2d at 426-27, 95 S. Ct. at 2261-62.

## II.   Suppression of the Tape Recordings

The State also contends that the trial court's February 22, 2006, suppression order is erroneous as a matter of law because Hunt's "voluntary, non-custodial" statements were made during a "judicially authorized overhear" and, therefore, the July 31, 2002, and August 6, 2002, recordings are admissible. We also find (1) that the tapes of Hunt's statements to Davis would not have been made but for the illegal arrests by the police (Silverman, 365 U.S. at 511, 5 L. Ed. 2d at 739, 81 S. Ct. at 682-83), and (2) that the tapes of Hunt's statements to Davis are fruits from the illegal arrests that preceded Hunt's trips to the Area 4 police station on July 31, 2002, and on August 6, 2002. Wong Sun, 371 U S. at 485, 9 L. Ed. 2d at 454, 83 S. Ct. at 416. Accordingly, the trial court did not err when it suppressed the tapes of Hunt's statements to Davis on July 31, 2002, and on August 6, 2002. Brown, 422 U.S. at 603-04, 45 L. Ed. 2d at 426-27, 95 S. Ct. at 2261-62.

Finally, even if the State's tapes were not the fruit of an illegal arrest, the trial court's decision to exclude the tapes would still be affirmed. The State contends that parts of the July 31, 2002, recording were audible and argues that the trial court abused its discretion when it excluded the entire tape and that its evidentiary ruling should be reversed. Our supreme court has held that "[a] partially inaudible sound recording is admissible unless the inaudible portions are so substantial as to render the recording untrustworthy as a whole." People v. Manning, 182 Ill. 2d 193, 212 (1998). "The admission of a recording that is partially inaudible, or that reproduces only a part of a statement or conversation, is a matter within the trial court's discretion." Manning, 182 Ill. 2d at 212. Therefore, we review the trial court's evidentiary rulings related to the exclusion of the July 31, 2002, and August 6, 2002, tapes under an abuse of discretion standard of review.

Here, the trial court specifically found that it was unable to discern more than a word or two sporadically on the tapes; that the tapes were of such poor quality that it was concerned that jurors "with different hearing abilities may have different ability to discern what was said and the word differences cannot be held the same for each of the jurors;" and that the tapes were "useless." We have listened to the July 31, 2002, tape and the August 6, 2002, tape (which the State concedes is inaudible), and we find that the inaudible portions of the July 31, 2002, tapes are so substantial that Hunt's statements during his conversations with Davis cannot be understood. We hold that the trial court's finding that the July 31, 2002, recordings would be useless to a factfinder was not an abuse of its discretion. Accordingly, we also affirm the trial court's order excluding the tape recordings because the July 31, 2002, and the August 6, 2002, tapes are inaudible.

CONCLUSION

In conclusion, because Hunt was illegally arrested by the police, because Hunt made statements to Davis after the illegal arrests, because there was no attenuation of the taint of the illegal arrests, and because Hunt's statements to Davis and the tapes of the Hunt-Davis conversations were the fruit of the illegal arrests, we find that the State's arguments regarding custodial interrogation are moot. Wong Sun, 371 U.S. at 485, 9 L. Ed. 2d at 454, 83 S. Ct. at 416. We also find that pretrial detainees remanded to the custody of the sheriff, after the court sets bail, cannot be arrested and removed from the Cook County jail by another law enforcement authority like the Chicago police and taken to a police station on a uncharged offense the police are investigating without a court order: an arrest warrant or some other judicial writ. Campa, 217 Ill. 2d at 262-65. Accordingly, we hold that Hunt's statements to Davis and the tapes of the Hunt-Davis conversations on July 31, 2002, and on August 6, 2002, were the fruits of Hunt's illegal arrests, therefore, the trial court did not err when it suppressed Hunt's statements or the tapes of his conversations with Davis.

Affirmed.

CAMPBELL, J., and MURPHY, J., concur.