Fourth Division
August 19, 2010

No. 1-06-0824

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 11006 |
| | ) | |
| TAVARES HUNT, | ) | Honorable |
| | ) | Fred G. Suria, Jr., |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

In May 2002, Tavares Hunt, the defendant, was incarcerated in the Cook County jail on a "no bail" order. On April 13, 2003, Hunt was arrested for the murder of Shakir Beckley, and on May 27, 2003, a Cook County grand jury indicted Hunt and charged him with 33 counts of murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 2002)), 6 counts of attempted murder (720 ILCS 5/9-1(a)(1) (West 2002)), 2 counts of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2002)), 1 count of aggravated battery with a firearm (720 ILCS 5/12-4.2 (West 2002)), 7 counts of attempted armed robbery (720 ILCS 5/18-2(a) (West 2002)), 1 count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2002)), and 1 count of aggravated battery with a weapon (720 ILCS 5/12-4(b)(1) (West 2002)).

On January 15, 2005, Hunt filed a motion to suppress statements,[1] and on January 23, 2006, he filed a motion to exclude inaudible tape recordings that were made of his conversations

---

[1] Hunt's motion to suppress statements is not included in the record.

with Mycal Davis on July 31, 2002, and August 6, 2002. On February 22, 2006, the trial court granted Hunt's motions. The State appealed from the trial court's February 22, 2006, order suppressing Hunt's statements and the tape recordings that were made of his conversations on July 31, 2002, and on August 6, 2002, and presented two issues for review: (1) whether the trial court erred when it suppressed Hunt's statements to Davis which were made during the course of a judicially authorized overhear of Hunt's conversations with Davis, and (2) whether the trial court abused its discretion when it excluded the Hunt-Davis overhear tapes which the State argued are only "partly inaudible."

On direct appeal, this court affirmed the trial court's order. People v. Hunt, 381 Ill. App. 3d 790 (2008). The Illinois Supreme Court reviewed the appellate court's judgment and affirmed it in part, reversed it in part, and remanded the case for this court to consider whether Hunt's statements should be suppressed on fifth amendment and McCauley (People v. McCauley, 163 Ill. 2d 414 (1994)) grounds. People v. Hunt, 234 Ill. 2d 49 (2009). For the following reasons, we affirm.

BACKGROUND

The record reveals that multiple hearings were held on the defendant's motion to suppress statements and on his motion to exclude inaudible recordings. Below is a summary of the testimony that is relevant to a resolution of the issues in this case.

Lieutenant Joseph P. Murphy

Lieutenant Joseph P. Murphy testified that in 2002, he was assigned as the commanding officer of the Chicago police department's cold case squad. He testified that in 2002 he worked

with Detective John Murray and several other officers in the cold case squad. Lieutenant Murphy also stated that over a period of months prior to July 31, 2002, he worked with Assistant State's Attorney Hovey on the investigation of Shakir Beckley's murder.

Lieutenant Murphy recalled questioning Tavares Hunt several times in 2002 about Shakir Beckley's murder. He testified that his first meeting with Hunt was in May 2002. Lieutenant Murphy's cold case squad detectives picked Hunt up from the Cook County jail, where Hunt was incarcerated on an unrelated charge. The lieutenant explained that there was a definite procedure for taking custody of Hunt from the Cook County jail. According to the lieutenant, the Chicago police told Cook County jail officials that they were taking custody of Hunt for an "investigative procedure" and that they would remove him from the jail.

Lieutenant Murphy testified that his officers brought Hunt to the Chicago police department's Area 4 police station for questioning on more than one occasion beginning in mid-May 2002. He stated, "[W]e went over there, we picked him up, advised him of his rights. Then we talked to him about our investigation, unrelated to the one he is in custody for." Lieutenant Murphy further testified that his detectives read Hunt his Miranda (Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) rights at the Area 4 police station and that Hunt waived his rights before talking with the lieutenant and other officers about the Shakir Beckley murder. Lieutenant Murphy also testified that Hunt consented to a polygraph examination in May 2002 and that Hunt may have been fingerprinted when he spent the night at the Area 4 police station in May 2002.

Sometime in July 2002, Lieutenant Murphy testified that he began to work with Davis,

another inmate incarcerated at the Cook County jail, on the Shakir Beckley murder investigation. Lieutenant Murphy testified that Davis told him that Hunt had made incriminating statements in a conversation about the Beckley murder and the lieutenant asked Davis if he could get Hunt to repeat those statements. Lieutenant Murphy testified that he told Davis "his options" before he agreed to wear a wire for a judicially authorized overhear. According to Lieutenant Murphy, he and Assistant State's Attorney Hovey had numerous conversations about the Beckley investigation, that they eventually decided to use Davis, and that he and Assistant State's Attorney Hovey planned the overhears of Hunt's conversations. Lieutenant Murphy stated that on or about July 17, 2002, his cold case squad detectives removed Hunt from the Cook County jail and brought him to the Area 4 police station for a lineup.

The July 31, 2002, Overhear

Lieutenant Murphy testified that on July 31, 2002, he spent most of that day with Davis, the informant. Lieutenant Murphy stated that he took Davis to court to get judicial authorization for the planned overhear on July 31, 2002.[2] According to Lieutenant Murphy, he and Davis went directly from court to the Area 4 police station, where the police wired Davis in "about five minutes" and put him in an interview room with Hunt.

Lieutenant Murphy further testified that Detective Murray removed Hunt from the Cook County jail earlier on July 31, 2002, and brought him to the Area 4 police station for the planned overhear. According to Lieutenant Murphy, Hunt was put in an interview room with Davis

_____

[2] It should be noted that Detective Murray testified at the suppression hearing that Judge McSweeney-Moore approved the overhear on July 30, 2002.

around 3 p.m. on July 31, 2002, and no one else was allowed in the room with the two men. Lieutenant Murphy testified that the July 31, 2002, overhear began at 3 p.m. and that it ended shortly after 4 p.m. that day. Lieutenant Murphy insisted that Hunt was brought to the Area 4 police station on July 31, 2002, "strictly for purposes of participation in a line-up" and for the overhear. Finally, the lieutenant testified that he monitored the overhear sessions on July 31, 2002, and on August 6, 2002, and that neither he nor any of his detectives spoke to Hunt on either of those days about the Shakir Beckley investigation.

Meeting With Hunt's Attorney

While Hunt was in the room with Davis, Lieutenant Murphy testified that he and his detectives were in another room monitoring Hunt's conversation. When he took a break from monitoring Hunt's conversation, Lieutenant Murphy testified that he stepped out of the room and someone told him that a public defender, Christopher Anderson, was looking for Hunt.

Lieutenant Murphy met with Mr. Anderson, who told him that he represented Hunt on an unrelated charge. Mr. Anderson asked him why Hunt was at the Area 4 police station and Lieutenant Murphy testified that he told Mr. Anderson that there was an ongoing investigation and that a lineup was set. Lieutenant Murphy recalled that Mr. Anderson told him that he wanted to see his client and that he wanted to be present during any lineups. According to Lieutenant Murphy, he stopped the overhear and Mr. Anderson was allowed to meet with his client. At the conclusion of Hunt's meeting with Mr. Anderson, Lieutenant Murphy testified that Mr. Anderson told the lieutenant and the other officers present that he was invoking Hunt's right to remain silent and to consult with counsel during questioning.

The August 6, 2002, Overhear

Lieutenant Murphy testified that only one overhear was done on July 31, 2002. However, he further testified that two separate overhears were done of Hunt and Davis' conversations at the Area 4 police station on August 6, 2002, one in the morning and one in the late afternoon. He further testified that on August 6, 2002, no Chicago police officers tried to speak with Hunt about the Shakir Beckley murder. Lieutenant Murphy also testified that he reviewed the overhear tapes of conversations that he had monitored between Davis and Hunt on July 31, 2002, and on August 6, 2002. According to Lieutenant Murphy, the tapes he reviewed accurately reflected the conversations that he monitored on July 31, 2002, and on August 6, 2002.

Tavares Hunt

Tavares Hunt testified that he was arrested on May 14, 2002, and locked up in the Cook County jail for an unrelated charge. Hunt testified that on May 18, 2002, Chicago police officers removed him from the Cook County jail and transferred him in handcuffs to the Area 4 police station. When he got to the Area 4 police station on May 18, 2002, Hunt recalled that someone told him that he was there for interrogation. Hunt testified that he recognized the prior witness (Lieutenant Murphy) as one of the officers present at the Area 4 police station on May 18, 2002. Hunt stated that he did not remember the names of the other police officers that questioned him on May 18, 2002, about the murder they were investigating. Hunt testified that he repeatedly told the officers that he did not know anyone in the pictures they showed him and that he had no knowledge of and had not heard anything about the murder they were investigating.

1-06-0824

Hunt recalled telling the police on May 18, 2002, that he would not talk without his lawyer being present but the police continued to question him. Hunt testified that after questioning, he was taken for a polygraph test on May 18, 2002, and on the next day, May 19, 2002, he was fingerprinted by the Chicago police before being taken back to the Cook County jail.

Hunt testified that, at the end of June 2002, he met Christopher Anderson, his public defender, in court on the unrelated case. Hunt recalled speaking to Mr. Anderson about the Chicago police "snatching him" out of jail to interrogate him about another case. Hunt further testified that he asked for Mr. Anderson's advice about the police questioning him. Hunt recalled that Mr. Anderson told him not to talk to the police unless a lawyer was there. Hunt also stated that he asked Mr. Anderson for his phone number that day.

Hunt recalled that on July 18, 2002, the Chicago police again removed him from the Cook County jail and took him to the Area 4 police station. Hunt could not remember the names of the other detectives who questioned him that day, but he did recall that he told them that he did not want to talk about their investigation and that he wanted to talk with a lawyer.

Hunt testified that on July 31, 2002, Cook County jail guards told him that the Chicago police were coming to get him to put him in a lineup. Hunt asked the Cook County guards if he could make a phone call, the guards permitted him to make a call, and he called his lawyer. Hunt stated that he left a voice mail message for Mr. Anderson telling him that the Chicago police were taking him back to the Area 4 police station for a lineup, and he asked Mr. Anderson to come to the station.

After he called his lawyer on July 31, 2002, the Chicago police took Hunt in handcuffs to the Area 4 police station, where he was put into a room with a man who identified himself as Mycal Davis. Hunt testified that he never knew Davis before the police put them in that room together on July 31, 2002. As Hunt recalled the incident, he was in that room alone with Davis for about an hour on July 31, 2002. Hunt testified that when he saw his public defender, later on July 31, 2002, at the Area 4 police station, Mr. Anderson told the police that Hunt would not talk to them without an attorney being present during questioning. Hunt recalled telling the police on July 31, 2002, in his lawyer's presence, that he wanted to remain silent and that he wanted his lawyer present during any questioning.

Hunt testified that a week later, on August 6, 2002, the Chicago police removed him again from the Cook County jail and took him to the Area 4 police station. Hunt recalled that on that day the police, for the second time, put him in a room with Davis and he was held there for hours this time. Hunt also testified that he did not know that Davis was wearing a wire but he recalled eventually telling Davis to stop talking to him that day.

Public Defender Christopher Anderson

Christopher Anderson testified that in June 2002, he was the public defender assigned to Judge Garcia's courtroom and that Hunt's case was assigned to him at arraignment on June 28, 2002. Mr. Anderson recalled speaking with Hunt in the lockup on June 28, 2002, and that he had made contemporaneous notes[3] of his conversations with Hunt.

---

[3] Hunt waived his attorney-client privilege to his public defender's notes covering the period from their first meeting on June 28, 2002, until he invoked his rights, at the Area 4 police

Mr. Anderson testified that on June 28, 2002, Hunt told him that the Chicago police were talking to him about an unrelated, uncharged matter, and he told Hunt not to talk to the police. On July 12, 2002, again in Judge Garcia's lockup, Hunt told Mr. Anderson that the police were still trying to talk with him. Mr. Anderson testified that he could not discuss the matter in the lockup with others present but he stated that he again told Hunt not to talk to the police.

Mr. Anderson further testified that on July 31, 2002, he got a voice mail message from Hunt telling him that the Chicago police were removing him from the Cook County jail and taking him to the Area 4 police station. Next, Mr. Anderson testified that he called the Area 4 police station and was told that Hunt was there. Mr. Anderson testified, from his contemporaneous notes, as to the events that occurred on July 31, 2002. According to Mr. Anderson, he arrived at the Area 4 police station at 3:14 p.m. on July 31, 2002, but the police did not permit him to meet with his client, Hunt, until 4:02 p.m. After meeting with Hunt, Mr. Anderson told Lieutenant Murphy and Detective Murray that Hunt was invoking his right to remain silent and to have counsel present during questioning. Finally, Mr. Anderson told the police on July 31, 2002, that he wanted to be present at any lineups involving Hunt.

### Detective John Murray

The State was allowed to call Chicago police detective John Murray as a rebuttal witness and he testified that in May of 2002, he was assigned to the Chicago police department's cold case unit. He recalled that in May 2002, he was working on the Shakir Beckley murder.

---

station on July 31, 2002. Mr. Anderson's six pages of notes were marked as People's Group Exhibit 2, but they were not included in the record on appeal.

Detective Murray stated that on May 17, 2002, he made the arrangements to remove Hunt from the Cook County jail so that he could bring him to the Area 4 police station the next day. He also testified that on May 18, 2002, he and Detective Przepiora took Hunt from the Cook County jail and drove him to the Area 4 police station. Detective Murray admitted that Hunt had no choice about being brought to the Area 4 police station on May 18, 2002.

The May 18, 2002, Police Interrogation

Detective Murphy testified that on the morning of May 18, 2002, he and Detective Przepiora started questioning Hunt at the Area 4 police station. Detective Murray recalled that he interviewed Hunt for approximately 45 minutes that morning. Detective Murray testified that on May 18, 2002, Hunt denied any involvement in the Shakir Beckley murder and that Hunt claimed to have an alibi. Detective Murray also testified that he and the other cold case detectives did not believe what Hunt was saying, so Detective Murray asked Hunt to take a polygraph test. According to Detective Murray, Hunt agreed to take the polygraph, so he and Detective Przepiora took Hunt to the Homan Square station for the polygraph test. Detectives Przepiora and Murray brought Hunt back to the Area 4 police station after the test on May 18, 2002.

After returning to the Area 4 police station from the polygraph test on May 18, 2002, Detectives Przepiora and Murray interviewed Hunt again for approximately 45 minutes. Detective Murray testified that Hunt denied any involvement in the Beckley murder "all day." Because the officers' questioning went into the night and because the officers wanted to question Hunt further, Detective Murray stated that he and the other detectives decided to keep Hunt at

the Area 4 police station overnight on May 18, 2002.

The May 19, 2002, Police Interrogation

Detective Murray testified that on May 19, 2002, the next day, he and Detective Przepiora interviewed Hunt again. He recalled that Lieutenant Murphy also interviewed Hunt on May 19, 2002. Detective Murray testified that Hunt continued to deny any involvement in the crime about which he was being questioned. Detective Murray testified that Hunt was returned to Cook County jail later on May 19, 2002.

The July 16, 2002, Meeting With Police Informant Davis

Detective Murray stated that Davis told him and other police officers on July 16, 2002, that he knew Hunt and that Hunt was involved in the Shakir Beckley murder. Davis also told the officers that he and Hunt had spoken about the Beckley murder and that Hunt had said that he was the "guy" with the rifle. Davis also told the police that he thought he could get Hunt to repeat the conversation about the Beckley murder. After the conversation with Davis, Detective Murray testified that he and the other officers decided to set up an overhear using Davis as the consenting party.

On July 30, 2002, The Judge Meets With Davis

Detective Murray testified that, on July 30, 2002, he was present when Davis was taken to the State's Attorney's office by Chicago police officers to sign as the consenting party for the overhear. Detective Murray recalled that Davis was taken before Judge McSweeney-Moore for review of the application for the eavesdropping order on that same day, July 30, 2002.[4]

_____

[4] It should be noted that Lieutenant Murphy testified that the overhear was approved by

The July 31, 2002, Overhear

Detective Murray testified that on July 31, 2002, he and Detective Przepiora removed Hunt from the Cook County jail around noon and took him to the Area 4 police station. Detective Murray was certain that none of the cold case officers interviewed Hunt that day. Detective Murray recalled that he and his team put Hunt in an interview room and left him there alone for about three hours. The officer also testified that Hunt was not handcuffed while in the interview room that day and that he gave Hunt food and water.

Detective Murray testified that at about 2:45 p.m. on July 31, 2002, Davis was brought to the Area 4 police station. He also stated that another officer took Davis into a room and put the wire on him. Detective Murray testified further that he and his team put Davis in the interview room with Hunt on July 31, 2002. Once Davis entered the room with Hunt, Detective Murray stated that he went into another room to listen to the conversation between Hunt and Davis. Detective Murray recalled that Lieutenant Murphy and another officer were in a room with Davis on July 31, 2002. At some point during the overhear, Detective Murray recalled that Lieutenant Murphy left the room. According to Detective Murray, when Lieutenant Murphy came back, they listened a bit more to the conversation between Hunt and Davis before Lieutenant Murphy ended the overhear. Shortly thereafter, Lieutenant Murphy told Detective Murray that a public defender was there to see Hunt. After an hour on July 31, 2002, Detective Murray testified that the overhear was stopped.

---

Judge McSweeney-Moore on July 31, 2002.

Meeting With Hunt's Attorney

Detective Murray testified that he met public defender Christopher Anderson at the Area 4 police station after Mr. Anderson consulted with Hunt in an interview room on July 31, 2002. Mr. Anderson told Detective Murray that Hunt had been advised to remain silent and not to talk to the police without his lawyer being present. At that time, Detective Murray asked Hunt if he was invoking his rights. According to Detective Murray, Hunt said "yes." Finally, Detective Murray testified that the first time Hunt invoked his rights was after the overhear was stopped on July 31, 2002.

Application for Use of Eavesdropping Device Unsealed

On January 15, 2004, the trial court ordered the State's Attorney's office to unseal the envelopes and original application for the judicially authorized use of an eavesdropping device. The State's Attorney's office was also ordered to retain custody of the original tapes and application.[5]

The June 27, 2005, Hearing

The parties first argued the merits of Hunt's motion to suppress on June 27, 2005. The trial court held:

"It is clear that prior to July 31st, defendant had indicated he did not wish

---

[5] We note that Supreme Court Rule 608 provides that the record on appeal must contain the "eavesdropping orders, and any similar documents." 210 Ill. 2d R. 608(a)(6). The State had custody of the eavesdropping application and orders but failed to include the eavesdropping application and orders in the record as required by the rules.

to speak to the police regarding this case. Or wanted to have his lawyer with him, whichever, however you wish to phrase it."

The trial court stated that the issue presented was not whether the recorded statements were voluntary, but the legal effect of Mr. Anderson's representation of Hunt on an unindicted case where counsel had actually appeared at the Area 4 police station at 3:14 p.m. on July 31, 2002, and asked repeatedly to speak with his client. The trial court then held that Hunt had a right to speak with his attorney on July 31, 2002, within a reasonable time after his attorney had arrived at the Area 4 police station, and because Hunt's attorney was not present on August 6, 2002, when Hunt spoke with Davis, that those August 6, 2002, statements were freely given. Finally, the trial court suppressed the last 45 minutes of the July 31, 2002, tape but denied Hunt's motion to suppress the statements recorded on the August 6, 2002, tape.

### The July 12, 2005, Hearing

On July 12, 2005, on its own motion, the trial court vacated its June 27, 2005, order. After further consideration, the trial court stated that it was satisfied that Miranda warnings were not at issue in the case. The trial court expressed concern about what, if any, professional duty an assistant State's Attorney has to not seek further information without the presence of defense counsel from a person who has asked that his counsel be present during further questioning. Therefore, after vacating its June 27, 2005, order, the trial court entered and continued the defendant's motions to suppress for further argument.

### The February 15, 2006, Hearing

On January 23, 2006, Hunt filed his motion to exclude inaudible recordings.

Approximately one month later, on February 15, 2006, the trial court heard arguments focused on the inaudibility of the July 31, 2002, and the August 6, 2002, tapes. The court found that all of the tapes were inaudible and that they would not be admitted. The trial court then offered to review *in camera* those portions of the tapes that the assistant State's Attorney considered audible. The assistant State's Attorney declined the trial court's offer and requested that the trial court admit the July 31, 2002, and August 6, 2002, tapes in their entirety. The trial judge found that the July 31, 2002, and August 6, 2002, tapes were inaudible, but deferred entry of a final order at the State's request.

The February 22, 2006, Hearing

On February 22, 2006, the trial court resumed the hearing on the defendant's motion to suppress statements and entered its suppression order. After the trial court entered its suppression order, the assistant State's Attorney filed a notice of substantial impairment and a notice of appeal from the trial court's February 22, 2006, order.

Appellate Court's Decision

On March 27, 2008, this court affirmed the trial court's order. First, this court held that, pursuant to section 19.5 of the County Jail Act (730 ILCS 125/19.5 (West 2002)) and People v. Campa, 217 Ill. 2d 243 (2005), a judicial order is required to transfer custody of a pretrial detainee from the custody of the sheriff to the custody of the police for the purpose of investigating an unrelated crime. Hunt, 381 Ill. App. 3d at 805. Next, this court held that Hunt was illegally arrested when he was removed from the county jail on July 31, 2002, and August 6, 2002, without an arrest warrant or a court order. Hunt, 381 Ill. App. 3d at 806. This court

further held that Hunt's statements to Davis would not have been made but for the illegal arrests and that Hunt's statements to Davis were the fruits of the illegal arrests that preceded Hunt's trips to the police station on July 31, 2002, and August 6, 2002. Hunt, 381 Ill. App. 3d at 807. Finally, this court held that the recordings were properly suppressed because they were the fruits of Hunt's illegal arrest and because the recordings were inaudible. Hunt, 381 Ill. App. 3d at 808-09.

Illinois Supreme Court's Decision

First, the Illinois Supreme Court held that the appellate court did not exceed the scope of its review on interlocutory appeal because the trial court suppressed all of the statements and both recordings. Hunt, 234 Ill. 2d at 58. Next, the Illinois Supreme Court held that "section 19.5 of the [Cook County] Act indicates the legislature did not intend to require a judicial order to release a prisoner to law enforcement officials or the State's Attorney for purpose of investigating an unrelated criminal matter." Hunt, 234 Ill. 2d at 64. Next, the Illinois Supreme Court held that section 19.5 of the County Jail Act permits prisoner transfers without the need for a court order, and reversed that portion of the appellate court's judgment that affirmed the trial court's suppression of all of Hunt's statements on fourth amendment grounds. Hunt, 234 Ill. 2d at 65. However, the Illinois Supreme Court affirmed the appellate court's suppression of the July 31, 2002, and August 6, 2002, recordings on the ground that the tape recordings were inaudible. Hunt, 234 Ill. 2d at 66. Therefore, the Illinois Supreme Court affirmed in part, reversed in part, and remanded the case to the appellate court to address the following issue: whether Hunt's statements should be suppressed on fifth amendment and McCauley grounds.

1-06-0824

ANALYSIS

This court has been directed to determine whether Hunt's statements would be suppressed under the fifth amendment or under McCauley. We note that the fifth and fourteenth Amendments of the United States Constitution and article I, section 10, of the Illinois Constitution guarantee defendants the right against self-incrimination. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, §10. The right against self-incrimination includes the right to an attorney. Edwards v. Arizona, 451 U.S. 477, 485-86, 68 L. Ed. 2d 378, 387, 101 S. Ct. 1880, 1885 (1981) ("The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation"); McCauley, 163 Ill. 2d at 421. However, a defendant may waive the right against self-incrimination, and therefore the right to an attorney, provided that the waiver is voluntary, knowing, and intelligent. McCauley, 163 Ill. 2d at 421, citing People v. Evans, 125 Ill. 2d 50, 74 (1988). "In determining whether a defendant knowingly and intelligently waived his right to an attorney, a court must consider the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation, without one circumstance or factor controlling." McCauley, 163 Ill. 2d at 421-22, citing People v. Reid, 136 Ill. 2d 27, 54-55 (1990). The State must prove, by a preponderance of the evidence, that the defendant knowingly, intelligently, and voluntarily waived his or her rights. McCauley, 163 Ill. 2d at 422, citing Reid, 136 Ill. 2d at 51.

Standard of Review

The review of a trial court's ruling on a motion to suppress evidence presents mixed

questions of law and fact. People v. Pitman, 211 Ill. 2d 502, 512 (2004). The United States Supreme Court has held that while a reviewing court should carefully review the factual findings and give due weight to the trial court's inferences from those facts, "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. United States, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996); People v. Sorenson, 196 Ill. 2d 425, 431 (2001). Therefore, we will accord great weight to the trial court's factual findings and will only reverse if they are against the manifest weight of the evidence, but we will review de novo the ultimate question of the State's legal challenge to the trial court's order granting Hunt's motions to suppress. Sorenson, 196 Ill. 2d at 431.

Fifth Amendment

In Miranda, the United States Supreme Court held that the fifth amendment privilege against self-incrimination prohibits the admission of statements given by a suspect during a custodial interrogation without the accused being informed about his rights. Miranda, 384 U.S. at 444-45, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612. Specifically, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. The Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. The "procedural safeguards" that must be employed are

now commonly referred to as <u>Miranda</u> warnings: the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. <u>Miranda</u>, 384 U.S. at 444, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612. The Supreme Court further held that the defendant may waive those rights, provided that the waiver is made voluntarily, knowingly and intelligently. <u>Miranda</u>, 384 U.S. at 444, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612. Finally, the <u>Miranda</u> Court explained that, once the warnings have been given, the following procedure must be followed:

> "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *** If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." <u>Miranda</u>, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.

The warnings set forth in <u>Miranda</u> were intended to preserve the fifth amendment privilege against self-incrimination during "incommunicado interrogation of individuals in a police-dominated atmosphere." <u>Miranda</u>, 384 U.S. at 445, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.

Such an atmosphere generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda, 384 U.S. at 467, 16 L. Ed. 2d at 719, 86 S. Ct. at 1624.

In Rhode Island v. Innis, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), the United States Supreme Court defined the term "interrogation." In Innis, the respondent was arrested and advised of his Miranda rights. The respondent informed the police that he wished to speak with an attorney, and the police placed the respondent in a police vehicle in order to transport the respondent to the police station. While in route to the police station, two of the police officers in the police vehicle with the respondent had a conversation in which one of the police officers voiced his concern that it would be bad if one of the disabled children from a local school found the missing weapon and was injured or killed. The respondent interrupted the officers' conversation and asked the police officers to turn the vehicle around so he could show them where the weapon was located.

The issue before the Supreme Court in Innis was "whether the respondent was 'interrogated' by the police officers in violation of the respondent's undisputed right under Miranda to remain silent until he had consulted with a lawyer." Innis, 446 U.S. at 298, 64 L. Ed. 2d at 306, 100 S. Ct. at 1688. The Innis Court concluded "that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Innis, 446 U.S. at 300-01, 64 L. Ed. 2d at 307-08, 100 S. Ct. at 1689. The Innis Court explained that the "functional equivalent" of express questioning was "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that

the police should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301, 64 L. Ed. 2d at 308, 100 S. Ct. at 1689-90. Specifically, the Court found that it could not be said that the police officers should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. Innis, 446 U.S. at 302, 64 L. Ed. 2d at 309, 100 S. Ct. at 1690. The Innis Court held that, in the facts before it, the respondent was not interrogated within the meaning of Miranda. Innis, 446 U.S. at 302, 64 L. Ed. 2d at 308, 100 S. Ct. at 1690.

The United States Supreme Court expanded upon its fifth amendment jurisprudence in Edwards, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880. In Edwards, the petitioner was arrested, brought to a police station, and informed of his Miranda rights. Initially, the petitioner indicated that he was willing to speak with the police, but he later invoked his fifth amendment right to have an attorney present during the custodial interrogation. The petitioner was returned to the county jail. The following morning, the police went to the county jail in order to speak with the petitioner. The police informed him of his Miranda rights and the petitioner subsequently made a statement to the police implicating himself in the crime. The issue before the United States Supreme Court was whether the fifth, sixth, and fourteenth amendments " 'require suppression of a post-arrest confession, which was obtained after [the petitioner] had invoked his right to consult counsel before further investigation.' " Edwards, 451 U.S. at 478, 68 L. Ed. 2d at 382, 101 S. Ct. at 1881. The Edwards Court held:

"[W]hen an accused has invoked his right to have counsel present

during custodial interrogation, a valid waiver of that right cannot

be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. \*\*\* [A]n accused \*\*\*, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85.

The Edwards court emphasized that "it is inconsistent with Miranda and its progeny for the authorities, at their insistence, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." Edwards, 451 U.S. at 485, 68 L. Ed. 2d at 387, 101 S. Ct. at 1885. The Edwards court found that the petitioner was subjected to a custodial interrogation on the second day, and the custodial interrogation was at the insistence of the police. Therefore, the Edwards court held that the petitioner's statement, made without having had access to counsel, did not amount to a valid waiver and was inadmissible. Edwards, 451 U.S. at 487, 68 L. Ed 2d at 388, 101 S. Ct. at 1886.

Later, in Illinois v. Perkins, 496 U.S. 292, 296, 110 L. Ed. 2d 243, 251, 110 S. Ct. 2394, 2397 (1990), the United States Supreme Court recognized that there are circumstances that do not implicate the concerns underlying Miranda. In Perkins, an inmate informed the police that the respondent had told him about a murder that the respondent had committed. The police

located the respondent at a jail where the respondent was being held on an unrelated matter. An undercover agent and an informant were placed in a cellblock with the respondent. The undercover agent asked the respondent if he had ever "done" anybody. The respondent said that he had and proceeded to describe at length the events of the murder.

The issue before the Supreme Court was "whether an undercover law enforcement officer must give Miranda warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response." Perkins, 496 U.S. at 295-96, 110 L. Ed. 2d at 250, 110 S. Ct. at 2396. The Supreme Court found that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying Miranda. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." Perkins, 496 U.S. at 296, 110 L. Ed 2d at 251, 110 S. Ct. at 2397. The Supreme Court further found that Miranda forbids coercion, but "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." Perkins, 496 U.S. at 297, 110 L. Ed 2d at 251, 110 S. Ct. at 2397. "Miranda was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates." Perkins, 496 U.S. at 298, 110 L. Ed. 2d at 252, 110 S. Ct. at 2399. The Perkins Court held that Miranda warnings are not required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent; therefore, "an undercover law enforcement officer posing as a fellow inmate need not give Miranda warnings to an incarcerated suspect before asking questions that may elicit an incriminating response."

Perkins, 496 U.S. at 300, 110 L. Ed. 2d at 253, 110 S. Ct. at 2399.

In the instant case, Hunt testified that on July 18, 2002, detectives questioned him and he told them he wanted to talk with a lawyer. The trial court found, "It is clear that prior to July 31st, defendant had indicated he did not wish to speak to police regarding this case." The evidence that defendant invoked his right to counsel on July 18, 2002, supports the trial court's finding of fact.

We must determine whether Hunt's statements to Davis, after invoking his right to counsel on July 18, 2002, and July 31, 2002, were made during custodial interrogations. The record reveals that Hunt was in police custody when he made the statements to Davis. Maryland v. Shatzer, No. 08-680, slip op. at 14-15 (U.S. February 24, 2010) (lawful imprisonment imposed upon conviction does not create the coercive pressures identified in Miranda, but pretrial detainees whose continued detention as suspects rest with those controlling their interrogation are in interrogative or custodial Miranda custody). The record further reveals that Hunt spoke with Davis, a police agent, who was posing as a fellow inmate and was wearing a wire to assist the State in obtaining incriminating information from Hunt. According to Perkins, although Hunt was in custody, Hunt's jailhouse conversation with Davis, a police agent whom Hunt believed to be a fellow inmate, did not constitute a custodial interrogation because the police were not in the room. Perkins, 496 U.S. at 296, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397 ("When a suspect consider himself in the company of cellmates and not officers, the coercive atmosphere is lacking"). Accordingly, we find, following federal case law, that because Hunt made the statements to Davis, an informant, and did not make the statements to the police, Hunt was not

1-06-0824

subject to a custodial interrogation and, therefore, <u>Miranda</u> warnings were not required prior to the conversation between Hunt and Davis. <u>Perkins</u>, 496 U.S. at 296-97, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397.

We find this case distinguishable from <u>Edwards</u>. As noted above, in <u>Edwards</u>, the police continued to question the petitioner after the petitioner made a request that an attorney be present during the interrogation. Although Hunt testified that he invoked his right to counsel on July 18, 2002, the police did not question Hunt on July 31, 2002, or on August 6, 2002; rather, Davis conversed with Hunt. The <u>Edwards</u> rule was designed to prevent the police from badgering a defendant into waiving his previously asserted <u>Miranda</u> rights. <u>Perkins</u>, 496 U.S. at 296-97, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397; see also <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983) (plurality opinion). In the instant case, the police did not badger Hunt because they did not speak with him on July 31, 2002, or August 6, 2002, concerning the Shakir Beckley murder.[6] Here, badgering by police officers, the evil sought to be avoided in <u>Edwards</u>, did not occur in the instant case because the police did not question Hunt. We find the

---

[6]It should be noted that in <u>Innis</u>, <u>Edwards</u>, and <u>Perkins</u>, the police were involved in a conversation with each defendant. Specifically, in <u>Innis</u>, the police talked with the respondent while he was riding in the back of the police vehicle. In <u>Edwards</u>, the police went to the jail where the petitioner was being held in order to speak with the petitioner. In <u>Perkins</u>, the undercover agent placed himself in the cellblock where the respondent was being held. In the instant case, the police removed Hunt from the county jail and took him to the Area 4 police station where Hunt talked with an informant or undercover police agent.

-25-

facts in Edwards distinguishable from the facts in the instant case because the statements in Edwards were made during a conversation between the petitioner and the police while Hunt's statements were made to a police informant or agent. Therefore, according to Perkins, Miranda was not violated and Hunt's statements to Davis did not violate Hunt's fifth amendment privilege against self-incrimination. Perkins, 496 U.S. at 296-97, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397.

The United States Supreme Court recently distinguished between interrogative or custodial Miranda custody and the noncoercive pressures of incarceration. Shatzer, slip op. at 14-15. In Shatzer, a police detective questioned the defendant, who was incarcerated in prison pursuant to a prior conviction, about allegations that the defendant had sexually abused his son. The defendant invoked his Miranda right to have counsel present during questioning, and the detective ceased questioning the defendant. The defendant was returned to prison. Approximately 2½ years later, a different police detective again questioned the defendant, who was still incarcerated in prison, regarding the accusations that the defendant sexually abused his son. The defendant waived his Miranda rights and made inculpatory statements. The defendant filed a motion to dismiss the inculpatory statements. The United States Supreme Court found that 14 days is a sufficient break in custody to end the presumption of involuntariness set forth in Edwards. Shatzer, slip op. at 11. The Court further found that "lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in Miranda." Shatzer, slip op. at 14. Accordingly, the Court held that because the defendant experienced a break in interrogative or Miranda custody that lasted more than two weeks, Edwards does not

-26-

mandate a suppression of the defendant's inculpatory statements made during the second interrogation. Shatzer, slip op. at 18.

We find the facts in Shatzer distinguishable from the facts in the instant case. Unlike Shatzer, which involved police interrogation, the instant case involved a conversation between Davis, an informant or police agent, and Hunt. Also, unlike Shatzer, involving a convicted felon incarcerated in a penal institution, Hunt was a pretrial detainee and suspect in a murder investigation whose detention rested with those controlling the interrogation. Shatzer, slip op. at 14-15. Therefore, we find the facts in Shatzer distinguishable from the facts in the instant case.

We note that the Illinois Supreme Court in McCauley recognized that Moran v. Burbine, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), is the controlling case for determining whether, under the federal constitution, a defendant's statement should be suppressed. McCauley, 163 Ill. 2d at 423, citing Burbine, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135. Specifically, the McCauley court noted that, "under Burbine, in determining the validity of a custodial suspect's waiver of the fifth amendment right to counsel, the relevant and narrow inquiry is whether his ability to understand or comprehend his rights has been compromised by the lack of information or the police conduct in withholding that information." McCauley, 163 Ill. 2d at 423.

We find the facts in Burbine distinguishable from the facts in this case. The critical facts in Burbine were as follows: (1) the police administered the required warnings to the respondent who was in custody on an unrelated case; (2) the police sought to assure that the respondent understood his rights; (3) the police obtained written waivers from the respondent prior to

eliciting each of the three statements; (4) the respondent's sister called a public defender on the respondent's behalf; (5) the police misinformed the public defender about their plans concerning the respondent; and (6) the police failed to inform the respondent of the public defender's efforts to reach him. Burbine, 475 U.S. at 415-18, 89 L. Ed. 2d at 417-18, 106 S. Ct. at 1138-39. In the instant case, the Burbine requirements were not met because (1) the police did not talk to Hunt on July 31, 2002, and August 6, 2002, and never informed Hunt of his rights pursuant to Miranda on July 31, 2002, or August 6, 2002; (2) the police were never assured that Hunt understood his rights because they never Mirandized him; and (3) the police never obtained express written waivers from Hunt prior to his discussions with Davis on July 31, 2002, and August 6, 2002. See Burbine, 475 U.S. at 421, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141. While the respondent in Burbine received Miranda warning before talking to the police, Perkins would not require Miranda warnings because Hunt was talking to an informant. Perkins, 496 U.S. at 296-97, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397. Accordingly, if we followed United States Supreme Court case law interpreting the fifth amendment, no Miranda warnings are required when a defendant is talking to an undercover agent or an informant; therefore, Hunt would not have to be informed about his counsel being present at the police station.

McCauley

Next, we must determine whether Hunt's statements to Davis would be suppressed under McCauley, which was decided under Illinois' constitutional guarantees.[7] McCauley, 163 Ill. 2d

---

[7]We note that the Illinois Supreme Court, when deciding a case under a federal constitutional provision, has followed the United States Supreme Court and treated inmate informants similar

at 423-24; see also Ill. Const. 1970, art. I, §10 (guaranteeing defendants the right against self-incrimination). The McCauley court noted that the United States Supreme Court has indicated that state courts have the authority to interpret their respective constitutional provisions more broadly than the United States Supreme Court interprets similar federal constitutional provisions. McCauley, 163 Ill. 2d at 426, citing Oregon v. Hass, 420 U.S. 714, 719, 43 L. Ed. 2d 570, 575-76, 95 S. Ct. 1215, 1219 (1975). The McCauley court also noted that the United States Supreme Court permits the States to adopt " '*different requirements* for the conduct of [their] employees and officials as a matter of state law.' " (Emphasis in original.) McCauley, 163 Ill. 2d at 426, quoting Burbine, 475 U.S. at 428, 89 L. Ed. at 425, 106 S. Ct. at 1144. The McCauley court further noted that federal authorities are not precedentially controlling but merely guide the interpretation of state law. McCauley, 163 Ill. 2d at 436, citing Rollins v. Ellwood, 141 Ill. 2d 244, 275 (1990). Finally, the McCauley court held that final conclusions on the construction of state constitutional guarantees are for the Illinois Supreme Court to decide. McCauley, 163 Ill. 2d at 436, citing Rollins, 141 Ill. 2d at 275.

The McCauley court established that our state's constitutional guarantees afford defendants a greater degree of protection than does the federal counterpart. See McCauley, 163 Ill. 2d at 423 ("The day is long past in Illinois, however, where attorneys must shout legal advice to their clients, held in custody, through the jailhouse door"). The McCauley court held that "[o]ur State constitutional guarantees simply do not permit police to delude custodial suspects,

---

to undercover police officers for purposes of the fifth amendment. See People v. Manning, 182 Ill. 2d 193 (1998) (applying Perkins to a jailhouse informant).

exposed to interrogation, into falsely believing they are without immediately available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation." McCauley, 163 Ill. 2d at 423-24, citing Ill. Const. 1970, art. I, §§2, 10. Accordingly, as directed by the Illinois Supreme Court, we will apply McCauley to the facts in this case to determine whether Hunt's statements should be suppressed under Illinois' self-incrimination guarantee that is codified in article I, section 10 of the Illinois Constitution. Ill. Const. 1970, art. I, §10.

Before we review this case under McCauley, we must determine under Illinois law (1) whether Hunt was in police custody, (2) whether Davis, the informant, was a police agent, and (3) whether this was a custodial interrogation. The State maintained that Hunt was involved in a judicially authorized consensual overhear and the interrogation was a noncustodial interrogation because Hunt talked to Davis and did not talk with the police on July 31, 2002, and August 6, 2002.

We note (1) that Hunt invoked his right to counsel on July 18, 2002, and on July 31, 2002, after consulting with his attorney; (2) that Cook County jail prisoners, like Hunt, transferred pursuant to section 19.5 of the County Jail Act are "in custody" (Hunt, 234 Ill. 2d at 63); (3) that Hunt did not consent or initiate a conversation with the police or make a request to go to the Area 4 police station, so it was not a voluntary transfer; (4) that an overhear order authorized the police to place a wire on Davis, who consented to wear the wire; (5) that Davis, an inmate, was selected by the police because they believed he could persuade Hunt to make a statement implicating himself in the Shakir Beckley murder; and (6) that Davis was a police

agent because he was acting in concert with, and at the behest of, the police. People v. Stechly, 225 Ill. 2d 246, 301 (2007) (holding that a police agent is a party who gathers information to pass it along to the authorities).

Next, we must decide whether Davis's questioning of Hunt at the Area 4 police station constituted custodial interrogation under Illinois law. In People v. Perkins, 248 Ill. App. 3d 762 (1993), appeal denied, 153 Ill. 2d 567 (1993), the court defined "custodial interrogation" to include questioning by police agents and informants as well as police officers. Perkins, 248 Ill. App. 3d at 769. The legislature effectively codified the definition promulgated in Perkins in section 103-2.1 of the Code of Criminal Procedure of 1963. See 725 ILCS 5/103-2.1 (West 2006).[8] The Hunt case holds that Hunt was in custody when he was transferred from the county jail to the Area 4 police station where he was detained. Hunt, 234 Ill. 2d at 63. Davis, the police agent, was wired and asked Hunt questions so he could obtain incriminating information. There was a custodial interrogation because the police involuntarily removed Hunt from the county jail

---

[8] It should be noted that section 103-2.1 provides that "custodial interrogation" means an interrogation, at a place of detention or a police station, during which "(i) a reasonable person in the subject's position would consider himself or herself to be in custody, and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." It should also be noted that the definition in section 103-2.1 does not limit the use of the term "custodial interrogations" to questions that are asked by police officers; therefore, the definition in section 103-2.1 applies if a question is asked that is likely to elicit an incriminating response even if the question is asked by an undercover police agent, informant or officer.

so Hunt could be interrogated by Davis, the undercover police agent, and the police agent asked Hunt questions likely to elicit an incriminating response. See Perkins, 248 Ill. App. 3d at 769; see also 725 ILCS 5/103-2.1 (West 2006). Therefore, because Hunt invoked his right to counsel on July 18, 2002, and July 31, 2002, because Hunt was transferred, involuntarily, from the county jail on July 31, 2002, and August 6, 2002, because Hunt was in police custody and Davis was an undercover police agent, and because the police had Davis, their agent, wired so he could initiate questioning and obtain incriminating information about the Shakir Beckley murder from Hunt on behalf of the police, we hold that Hunt's interrogations on July 31, 2002, and on August 6, 2002, at the Area 4 police station were custodial interrogations. McCauley, 163 Ill. 2d at 427, 438-43, 447; Perkins, 248 Ill. App. 3d at 769; see also 725 ILCS 5/103-2.1 (West 2006); Ill. Const. 1970, art. I, §§2, 10.

Now, because we have decided that Hunt participated in custodial interrogations, McCauley directs this court to follow the rule in Smith, which held that under state law, the police possessed no authority to prevent or delay communication between an arrested person and his retained lawyer, and also that a custodial suspect's decision to waive counsel's assistance was likely to be affected by the withheld information. McCauley, 163 Ill. 2d at 427, citing People v. Smith, 93 Ill. 2d 179, 187-88 (1982), citing State v. Haynes, 288 Or. 59, 72-74, 602 P.2d 272, 278-79 (1979). The record reveals that on July 18, 2002, Hunt invoked his right to counsel and that on July 31, 2002, Hunt telephoned his attorney, a public defender, and requested that he come to the police station. Hunt's attorney came to the police station and requested access to Hunt. Hunt's attorney was denied access to Hunt from approximately 3:15 p.m. until

approximately 4 p.m. Following the rule in Smith, the police had no authority to "prevent or delay" communication between Hunt and his lawyer. McCauley, 163 Ill. 2d at 427, citing Smith, 93 Ill. 2d at 187-88, citing Hayes, 288 Or. at 72-74, 602 P.2d 272, 278-79. Hunt was also involuntarily removed from the county jail on August 6, 2002; therefore, after invoking his right to counsel on July 31, 2002, he had a right to consult with counsel before the custodial interrogation on August 6, 2002. See McCauley, 163 Ill. 2d at 438-43; Perkins, 248 Ill. App. 3d at 769; see also 725 ILCS 5/103-2.1, 103-3, 103-4 (West 2006).

Second, the McCauley court noted that under Illinois's guarantee of a person's privilege against self-incrimination (Ill. Const. 1970, art. I, §10), if the circuit court determines that a defendant knew that an attorney was being retained for him, that the attorney was present and had requested access to the defendant and that the police refused to inform the defendant of the immediate availability of the attorney, the circuit court should allow the defendant's motion to suppress. McCauley, 163 Ill. 2d at 438, quoting People v. Griggs, 152 Ill. 2d 1, 30 (1992). Here, the circuit court correctly suppressed Hunt's statements to Davis that occurred on July 31, 2002, because there was a custodial interrogation; because Hunt's attorney appeared at the police station, pursuant to Hunt's telephone message, and requested access to Hunt on more than one occasion; and because the police refused, for 45 minutes, to inform Hunt that his attorney was in the police station so that Davis, a police agent, could conclude the interrogation of Hunt. The trial court also correctly suppressed Hunt's statements on August 6, 2002, because, after invoking his right to counsel on July 31, 2002, there was a custodial interrogation and Hunt was not permitted to consult with counsel prior to the interrogation.

Third, the McCauley court noted that the 1970 Illinois Constitutional Convention debates indicate that the delegates intended that article I, section 10, incorporate then-existing federal constitutional principles regarding incommunicado interrogation. McCauley, 163 Ill. 2d at 439-40, citing People v. DiGuida, 152 Ill. 2d 104 (1992); 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1377; S. Gove & V. Ranney, Con-Con: Issues for the Illinois Constitutional Convention, 3, 24-35, 48 (1970); G. Braden & R. Cohn, The Illinois Constitution: An Annotated & Comparative Analysis 43-45 (1969). We find that Hunt was in police custody and was taken to the Area 4 police station involuntarily on July 31, 2002, and August 6, 2002; that Hunt was held incommunicado because, after invoking his right to counsel on July 18, 2002, and July 31, 2002, a lawyer was not permitted to have access or communicate with Hunt while Davis, a police agent, attempted to elicit incriminating information from Hunt about the Shakir Beckley murder during the custodial interrogations on July 31, 2002, for 45 minutes, and was denied the assistance of counsel on August 6, 2002. Therefore, we hold that the police officers' incommunicado custodial interrogations on July 31, 2002 and August 6, 2002, violated Hunt's article I, section 10, guarantee against self-incrimination. Ill. Const. 1970, art. I, §10.

Fourth, the McCauley court noted that under article I, section 2, the due process clause, the State guarantees an accused the right to the assistance as well as the presence of counsel during any custodial interrogation. McCauley, 163 Ill. 2d at 441; Ill. Const. 1970, art. I, §2. Hunt was denied the assistance of his counsel for 45 minutes during the custodial interrogations on July 31, 2002, and was denied the assistance of counsel on August 6, 2002 - - Hunt was held in a room at a police station while a police agent attempted to elicit incriminating information.

Therefore, we hold that Hunt's article I, section 2, due process rights were violated by the police when they denied Hunt the assistance of counsel, on July 31, 2002, and August 6, 2002, during the custodial interrogations. Accordingly, the trial court correctly suppressed Hunt's July 31, 2002, and August 6, 2002, statements under the due process clause of Illinois's constitution. McCauley, 163 Ill. 2d at 440-41; Ill. Const. 1970, art. I, §2.

Fifth, the McCauley court noted that section 103-4 of the Code of Criminal Procedure of 1963 codifies a statutory right of persons in custody to consult with an attorney and a concomitant duty on the part of public officers to admit such counsel to consult with persons in custody. McCauley, 163 Ill. 2d at 443, citing Ill. Rev. Stat. 1987, ch. 38, par. 103-4 (now 725 ILCS 5/103-4 (West 2002)). Here, Hunt was in the custody of the police; custodial interrogations were conducted by the police on July 31, 2002, and August 6, 2002; and the police, public officers, denied Hunt the assistance of counsel for 45 minutes on July 31, 2002, and Hunt received no assistance from an attorney on August 6, 2002. Therefore, the police officers' refusal to permit Hunt to confer with an attorney was a clear violation of the statutory right codified in section 103-4 of the Code of Criminal Procedure. 725 ILCS 5/103-4 (West 2002).

Finally, the McCauley court noted that the self-incrimination privilege in article I, section 10, of the Illinois Constitution only protects an accused from testimonial disclosures. McCauley, 163 Ill. 2d at 447 ("Section 10 ' "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature *** " ' "), quoting People ex rel. Bowman v. Woodward, 63 Ill. 2d 382, 385 (1976),

quoting Schmerber v. California, 384 U.S. 757, 761, 16 L. Ed. 2d 908, 914, 86 S. Ct. 1826, 1830 (1966); see also Ill. Const. 1970, art. I, §10. Section 10, the self-incrimination privilege, does not protect against nontestimonial disclosures such as requiring a person in custody to stand or walk in a police lineup, to speak prescribed words, to model particular clothing, or to give samples of handwriting, fingerprints, or blood. See McCauley, 163 Ill. 2d at 447; Schmerber, 384 U.S. at 764, 16 L. Ed. 2d at 916, 86 S. Ct. at 1832. Here, the police placed Davis, their agent or informant, in a room with Hunt in order to record Hunt's statements and to obtain incriminating information for the police. While Hunt's statements to Davis, the police agent or informant, during the custodial interrogations on July 31, 2002, and August 6, 2002, were testimonial disclosures that violated the self-incrimination privilege (Stechly, 225 Ill. 2d at 268, quoting Davis v. Washington, 547 U.S. 813, 822, 165 L. Ed. 2d 224, 237, 126 S. Ct. 2266, 2273-74 (2006) (statements are testimonial when the purpose of the interrogation is to establish or prove past events that are relevant to a later criminal prosecution)), the police would not violate the self-incrimination privilege if they placed Hunt in a lineup. See McCauley, 163 Ill. 2d at 447; Schmerber, 384 U.S. at 764, 16 L. Ed. 2d at 916, 86 S. Ct. at 1832. Accordingly, the trial court correctly suppressed Hunt's July 31, 2002, and August 6, 2002, statements to Davis, the police agent or informant, because Hunt's statements were testimonial disclosures during custodial interrogations that violated Hunt's self-incrimination privilege. McCauley, 163 Ill. 2d at 447; see also Stechly, 225 Ill. 2d at 268, quoting Davis, 547 U.S. at 822, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74.

Petition for Rehearing

In a petition for rehearing, the State argues that this court made erroneous findings of fact. First, the State disputes our statement that Hunt invoked his right to counsel on July 18, 2002. Hunt testified that, on July 18, 2002, he told detectives he wanted to talk with a lawyer. The trial court found, "It is clear that prior to July 31st, defendant had indicated he did not wish to speak to police regarding this case." The trial court's finding that Hunt invoked his right to counsel prior to July 31, 2002, is based on Hunt's testimony, and our statement that Hunt invoked his right to counsel on July 18, 2002, is based on the trial court's finding.

The State also disputes our finding that the State had custody of Hunt when Davis questioned him. Our supreme court, in Hunt, held that Hunt was in custody when police transferred him from the jail to the Area 4 police station where Davis questioned him. Hunt, 234 Ill. 2d at 63. The evidence supports the finding of custody.

The State contests our interpretation of Shatzer. We adhere to our explanation of Shatzer. The defendant in Shatzer experienced a break in interrogation of 2 ½ years. Here, a break of less than two weeks intervened between Hunt's invocation of his right to counsel during questioning on July 18, 2002, and Davis's interrogation of Hunt on July 31, 2002. A second break of less than two weeks intervened between Hunt's questioning on July 31, 2002, and the questioning on August 6, 2002. Throughout each of the periods of less than two weeks, Hunt remained in the intermittent custody of those who controlled the interrogation. The factual differences between this case and Shatzer require a different result.

Next, the State argues that we improperly applied retroactively the definition of

"custodial interrogation" our legislature codified in section 103-2.1 of the Code of Criminal Procedure. 725 ILCS 5/103-2.1 (West 2006). While other sections of the statute change the law (see People v. Amigon, 388 Ill. App. 3d 26, 30-32 (2009), appeal allowed, 233 Ill. 2d 565 (2009)), we find that the definition of "custodial interrogation" codifies earlier decisions. See Perkins, 248 Ill. App. 3d at 769. In Perkins, a police informant questioned the defendant in his jail cell, after the defendant had requested an attorney. The trial court suppressed the defendant's statements to the informant, finding that the custodial interrogation by the informant violated the defendant's constitutional rights. The Perkins court defined "custodial interrogation" to include questioning by police agents and informants as well as police officers. Perkins, 248 Ill. App. 3d at 769. The definition applied in Perkins has been codified in the statutory definition. See 725 ILCS 5/103-2.1 (West 2006). If the legislature meant to specify that "custodial interrogation" referred to questioning only by police officers, the legislature would have so specified. Instead, the legislature defined custodial interrogation to include any interrogation in which "a question is asked" that may elicit an incriminating response. By using the passive voice in the statute, the legislature indicated an intention not to limit the potential questioners to whom the provision applies. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 103, 60 L. Ed. 2d 66, 79, 99 S. Ct. 1601, 1609 (1979) (statutory use of passive voice placed no restriction on potential plaintiffs who could sue under the statute).

The State claims that the statutory definition of "custodial interrogation" leads to the absurdity that the court may admit into evidence statements obtained by deception as long as the defendant makes the statements when he is out of custody. The court in Perkins addressed this

argument and found no absurdity. The <u>Perkins</u> court said:

> "Because defendant had invoked his right to counsel, the actions of the authorities were improper and the statements made by defendant must be suppressed. [Citation.] That is not to say that the authorities could not have played out the same scam on defendant if he had not been in custody, because it seems clear that they could have done so without violating defendant's constitutional rights."
> <u>Perkins</u>, 248 Ill. App. 3d at 771.

Thus, the constitution may permit police to deceive the subject of an investigation when the subject remains free from custody, but similar deceptive practices by State agents offend the Illinois Constitution when the State has taken the subject into custody and he has invoked his right to counsel. <u>McCauley</u>, 163 Ill. 2d at 423-24; <u>Perkins</u>, 248 Ill. App. 3d at 771. The Illinois Constitution places special restrictions on State action once the State has placed the subject of an investigation who has invoked the right to counsel in the coercive environment of State custody. See <u>McCauley</u>, 163 Ill. 2d at 423-24; <u>Perkins</u>, 248 Ill. App. 3d at 771. We see no absurdity in permitting prosecutors to use against a defendant statements obtained from the defendant by deception when the defendant was not in custody, but barring the use of similar statements made by the defendant while in custody.

Finally, the State argues that the court should not suppress the statements here because police used deception, not force, to obtain the statements. According to the State, Hunt never proved the kind of compulsion necessary for suppression of statements under article I, section 10, of the Illinois Constitution of 1970.

Illinois courts have developed standards for determining when improper influence of law enforcement agents requires suppression of statements they have obtained. See McCauley, 163 Ill. 2d at 428-39. According to the court in Perkins:

"Miranda *** requires that the officials cease questioning a suspect immediately upon a request for an attorney. If the questioning continues after a suspect has requested an attorney, but without the attorney's presence, then a heavy burden is on the government to show that the suspect knowingly and intelligently waived his right to counsel. Further, although any statement given freely and voluntarily without any compelling influences is admissible in evidence, 'any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.' Miranda, 384 U.S. at 476, 16 L. Ed. 2d at 725, 86 S. Ct. at 1629."

Perkins, 248 Ill. App. 3d at 768.

When an accused invokes his right to counsel, the Illinois Constitution forbids both direct interrogation and "less direct techniques of persuasion." Perkins, 248 Ill. App. 3d at 771.

Here, as in Perkins, "the government's procedure was calculated to deceive defendant, so that he would not know to whom he was making incriminating statements." Perkins, 248 Ill. App. 3d at 769. Like the court in Perkins, we find that the deception ensured that defendant did not have the "opportunity to knowingly and intelligently waive his previously asserted right to have counsel present during questioning." Perkins, 248 Ill. App. 3d at 769. We cannot find a valid waiver of the right to counsel where Hunt was involuntarily removed from the county jail

by the police and merely responded to police-initiated custodial interrogation. Because Hunt invoked his right to counsel on July 18, 2002, and July 31, 2002, and was involuntarily removed from the jail, we find the actions of authorities improper, and therefore we must suppress the statements authorities obtained from defendant. See McCauley, 163 Ill. 2d at 447; Perkins, 248 Ill. App. 3d at 771. Accordingly, we deny the petition for rehearing.

CONCLUSION

In conclusion, we find under the fifth amendment, as interpreted by the United States Supreme Court in Miranda, Innis, Edwards, Perkins and Shatzer, that Hunt's statements to Davis, an undercover police agent or informant, would not be suppressed because federal case law does not consider an interrogation by an undercover police agent, informant or officer to be a custodial interrogation. We also find, however, under Illinois's constitution and statutes, as interpreted by the courts in McCauley and Perkins, that Hunt's interrogation by Davis, an undercover police agent or informant, would be considered a custodial interrogation; therefore, the trial court properly suppressed Hunt's statements to the undercover police agent or informant. McCauley, 163 Ill. 2d at 427, 438-43, 447; Perkins, 248 Ill. App. 3d at 769. Finally, Hunt, an Illinois citizen, was indicted by the State's Attorney of Cook County, Illinois, charged with violating an Illinois criminal statute and his case is pending in Illinois's courts where his federal fifth amendment rights were not violated, but his Illinois constitutional rights were violated; therefore, we think that Illinois's constitution, statutes and supreme and appellate court decisions should be followed in this case. Accordingly, we follow McCauley and suppress Hunt's statements to Davis.

Affirmed.

MURPHY, J., and STEELE, J., concur.